UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

CHRISTOPHER J. ZEIER,         )
         )
Plaintiff,         )
         )
v.         )
         )    Case No. 4:15-CV-00156-RWS-SPM
         )
         )
CAROLYN W. COLVIN,         )
Acting Commissioner of Social Security,         )
         )
Defendant.         )

## REPORT AND RECOMMENDATION
## OF UNITED STATES MAGISTRATE JUDGE

This is an action under 42 U.S.C. §§ 405(g) and 1383(c)(3) for judicial review of the final decision of Defendant Carolyn W. Colvin, the Acting Commissioner of Social Security, denying the applications of Plaintiff Christopher J. Zeier for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381, *et seq.* (the "Act").[1] This matter was referred to the undersigned United States Magistrate Judge for review and a recommended disposition pursuant to 28 U.S.C. § 636(b). The undersigned recommends that the decision of the Commissioner be affirmed.

### I.    FACTUAL BACKGROUND

#### A.  Plaintiff's Testimony Before the ALJ

On July 30, 2013, Plaintiff offered the following testimony before the ALJ. Plaintiff was born in 1963, has a GED, and lives with his parents. (Tr. 34-35). He has been in prison twice and

---

[1] Plaintiff initially also applied for Disability Insurance Benefits ("DIB") under Title II, but he later amended his onset date to a period after his insured status expired and waived his claim for Title II benefits. (Tr. 31, 305).

was released from prison on October 14, 2011, ten days before filing his application for disability benefits. (Tr. 38). In the past, he has been self-employed as a contractor, installing siding and windows and rehabbing homes, and as a bagel baker. (Tr. 35-36).

Plaintiff has had several heart attacks and has had six stents and a monitor put in his heart. (Tr. 38-39). Plaintiff gets pressure and pain in his chest, and he takes nitroglycerine, which helps. (Tr. 44-45). He testified that he can walk about a block before getting out of breath and having to sit down and rest for about 20 minutes. (Tr. 45-46). He can stand for about ten minutes without something to lean on. (Tr. 46). He can only climb one flight of stairs before getting out of breath. (Tr. 46). His hands hurt and he has trouble gripping things, and his doctors think he may have carpal tunnel syndrome. (Tr. 46-47). He could pick up a gallon of milk, but he would put it in his arms right away because his hands hurt. (Tr. 47). He walks for exercise about two blocks a day, with a rest in the middle. (Tr. 48).

Plaintiff was hospitalized in December of 2012 after attempting to commit suicide. (Tr. 37). After he was released two weeks later, Plaintiff began participating in group therapy, seeing a psychiatrist every six weeks, and seeing a case manager every three months. (Tr. 39-40). He does not feel like doing anything anymore, he spends his time watching TV or sleeping, and he has no social activities or friends, because he just doesn't want them. (Tr. 48-49). He has thoughts that he would be better off if he were not alive. (Tr. 50).

### B. Plaintiff's Treatment Records[2]

Plaintiff's medical records show that prior to his alleged November 2011 disability onset date, Plaintiff had at least two myocardial infarctions (one in November 2008 and one in January

---

[2] The following is not intended to be an exhaustive summary of Plaintiff's medical records. The summary below focuses, as do the parties' briefs, on the most relevant medical records during Plaintiff's alleged period of disability.

2010), underwent multiple cardiac catheterization procedures, and had multiple stents placed. (Tr. 223-24, 231-32, 246-47, 270-73, 429). Plaintiff was also treated for several other conditions and symptoms between 2008 and 2011, including chest pain and tightness, shortness of breath, arm numbness, legs falling asleep, syncope, coronary artery disease, tobacco abuse, dyslipidemia, hypercholesterolemia, and hypertension. (Tr. 215-18, 230, 250, 265-66, 304, 323, 331, 351, 363, 372, 419).

After his disability onset date, Plaintiff continued to have some problems with chest pain, shortness of breath, and syncopal episodes, and he had diagnoses including coronary artery disease, hypertension, hypercholesterolemia, hyperlipidemia, ischemic cardiomyopathy, carpal tunnel syndrome, and Hepatitis C. (Tr. 397-411, 428-431, 438-40, 443, 548, 542-45). Plaintiff's physical symptoms were highly variable. Plaintiff went to the hospital for acute chest pain in January 2012. (Tr. 397-400, 429-30). However, at a visit in February 2012, he denied chest pain, dizziness, and shortness of breath, and he stated that he felt fairly well and had started increasing his activity. (Tr. 439). At a follow-up visit in August 2012, he reported that he had occasional exertional chest pain that was variable and usually resolved with rest; he also indicated that he felt well, that his overall pattern had improved since six months ago, and that he remained active. (Tr. 436). Plaintiff again complained of chest pain in April 2013. (Tr. 522-23). In addition, in April 2013 it was noted that he was continuing to have syncopal episodes, including one that caused him to break a rib. (Tr. 521). However, at later 2013 visits, he denied chest pain and shortness of breath, and his heart examinations were normal. (Tr. 543-44, 582-83).

The record does not show any treatment for mental impairments during the alleged disability period prior to December 2012. On December 23, 2012, Plaintiff was admitted to the hospital after attempting suicide by drug overdose. (Tr. 487). On December 26, 2012, he was

transferred to Dr. Vadim Baram for a psychiatric evaluation. (Tr. 512). Dr. Baram noted that Plaintiff "seems to be fairly hopeless, helpless, worthless, or useless" and "appears quite pessimistic and negative towards himself." (Tr. 512). Dr. Baram diagnosed severe major depression, recurrent without psychosis; assigned Plaintiff a Global Assessment of Functioning ("GAF") score of 12;[3] and initiated medication and therapy. (Tr. 512-13). At discharge on January 7, 2013, Plaintiff had a GAF of 52,[4] his mood was "ok," his affect was calm and pleasant, his thought process was linear and logical, he denied suicidal or homicidal ideation, and he had fair insight and judgment. (Tr. 514). On January 14, 2013, Plaintiff was evaluated at BJC Behavioral Health. (Tr. 466-79). It was noted that he had a history of sexual abuse, that he had abused alcohol in the past, and that he had a GAF of 53. (Tr. 467-79). Plaintiff continued to receive treatment from Dr. Baram and from a therapist and case worker, Amanda Bohnenstiehl, for the next several months. Dr. Baram's mental status examinations frequently showed abnormalities in mood and affect and occasionally showed soft speech or decreased motor activity, and Dr. Baram sometimes noted that Plaintiff was sad and low or stayed in bed a lot. However, he consistently found Plaintiff to be pleasant, cooperative, neatly dressed, and well groomed, with a logical flow of thought and no suicidal ideations. (Tr. 574-77, 599). Ms. Bohnenstiehl sometimes noted that Plaintiff had depression and anxiety, but she also noted that

---

[3] The Global Assessment of Functioning Scale (GAF) is a psychological assessment tool wherein an examiner is to "[c]onsider psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness"; it does "not include impairment in functioning due to physical (or environmental) limitations." *Diagnostic and Statistical Manual of Mental Disorders (DSM-IV)*, 32 (4th ed. 1994). A GAF score between 11 and 20 indicates "some danger of hurting self or others (e.g., suicidal attempts without clear expectation of death; frequently violent; manic excitement)". *Id.*

[4] A GAF of 51-60 indicates "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." *DSM-IV* 32.

he was no longer having suicidal thoughts, that he felt his medication from Dr. Baram was working, and that he had mostly physical rather than mental complaints. (Tr. 592-98).

### C. Opinion Evidence

The record contains opinion evidence from several sources. On June 5, 2012, state agency physician Tom Dees, M.D., reviewed Plaintiff's medical records and summarized Plaintiff's statements regarding his functional limitations and the significant objective findings related to Plaintiff's heart conditions. (Tr. 432-33). Dr. Dees concluded that the evidence supported the conclusion that Plaintiff could perform light duties with minimal exertional activity. (Tr. 433).

On May 7, 2013, in a pre-sedation assessment performed before Plaintiff underwent a coronary angiography, Plaintiff's treating cardiologist, Dr. Vardi, noted that Plaintiff had "ASA Physical Status Classification: 3 (A patient with severe systemic disease)." (Tr. 532-33).

On May 30, 2013, Amanda Bohnenstiehl, MALPC, completed a Psychiatric Assessment for Social Security Disability Claim form. (Tr. 539). Ms. Bohnenstiehl stated that Plaintiff's present symptoms were major depressive disorder with alcohol dependence and that he had a GAF of 49.[5] She noted, "[Plaintiff] has had no severe depressive or suicidal issues since admission in January 2013. His main complaints have been pain-related keeping him from being mobile much of the time." She stated that he was not able to work normally at this time. When asked whether Plaintiff would be expected to remain unable to work, she stated, "By January 2014, if [Plaintiff]'s pain was subsided and he remained non-suicidal, he could work. W/pain as it is now and potential for depression he cannot work something stressful." She also stated that

---

[5] A GAF score between 41 and 50 indicates "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." *DSM-IV* 32.

he likely had not been able to work since summer 2012, when his depression worsened leading up to his hospitalization/suicide attempt in December 2012/January 2013. (Tr. 539).

On June 24, 2013, Plaintiff's treating psychiatrist, Dr. Baram, completed a Psychiatric Assessment for Social Security Disability Claim form. He stated that Plaintiff suffered from severe major depression, had mood liability and episodic depressed thoughts, and had a GAF of 38.[6] He opined that Plaintiff's condition was severe enough to prevent him from working at this time and that he would be expected to remain unable to work for at least 12 months from the time Dr. Baram began treating him forward. (Tr. 572). Dr. Baram also completed a Medical Assessment of Ability to Do Work-Related Activities (Mental) form in which he found that Plaintiff's ability to maintain his personal appearance was only "fair" (defined as "ability to function in this area is seriously limited, but not precluded") and that his ability to function in every other area examined was "poor or none" (defined as "no useful ability to function in this area"). These areas included following work rules, relating to co-workers and the public, interacting with supervisors, using judgment, being attentive and concentrating, following simple job instructions, behaving in an emotionally stable manner, and relating predictably in social situations. (Tr. 573). Dr. Baram also noted that Plaintiff was emotionally unstable, with a high suicide risk, and frequently needed intensive medication management and psychotherapy. (Tr. 573).

---

[6] A GAF score between 31 and 40 indicates "[s]ome impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) OR major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., depressed man avoid friends, neglects family, and is unable to work; child frequently beats up younger children, is defiant at home, and is failing at school)." *DSM-IV* 32.

## II.  PROCEDURAL BACKGROUND

On October 24, 2011, Plaintiff applied for DIB and SSI, alleging that he had been unable to work since November 2008 due to a heart condition and having had four heart attacks. (Tr. 115, 121, 128, 156). Plaintiff later amended his alleged onset date to November 18, 2011, placing the disability period after the expiration of his insured status for purposes of DIB. (Tr. 31, 205). After his application was denied, Plaintiff filed a Request for Hearing by Administrative Law Judge (ALJ) (Tr. 75-79). The ALJ held a hearing on July 7, 2013. (Tr. 24-56). On September 5, 2013, the ALJ issued an unfavorable decision finding Plaintiff not disabled. (Tr. 8-18). On November 20, 2014, the Appeals Council declined to review the case. (Tr. 1-3). Plaintiff has exhausted all administrative remedies, and the decision of the ALJ stands as the final decision of the Commissioner of the Social Security Administration.

## III.  STANDARD FOR DETERMINING DISABILITY UNDER THE ACT

To be eligible for benefits under the Social Security Act, a claimant must prove he or she is disabled. *Pearsall v. Massanari,* 274 F.3d 1211, 1217 (8th Cir. 2001); *Baker v. Sec'y of Health & Human Servs.*, 955 F.2d 552, 555 (8th Cir. 1992). The Social Security Act defines as disabled a person who is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A); *see also Hurd v. Astrue*, 621 F.3d 734, 738 (8th Cir. 2010). The impairment must be "of such severity that [the claimant] is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such

work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work." 42 U.S.C. § 1382c(a)(3)(B).

To determine whether a claimant is disabled, the Commissioner engages in a five-step evaluation process. 20 C.F.R. §416.920(a); *see also McCoy v. Astrue*, 648 F.3d 605, 611 (8th Cir. 2011) (discussing the five-step process). At Step One, the Commissioner determines whether the claimant is currently engaging in "substantial gainful activity"; if so, then he is not disabled. 20 C.F.R. § 416.920(a)(4)(i); *McCoy*, 648 F.3d at 611. At Step Two, the Commissioner determines whether the claimant has a severe impairment, which is "any impairment or combination of impairments which significantly limits [the claimant's] physical or mental ability to do basic work activities"; if the claimant does not have a severe impairment, he is not disabled. 20 C.F.R. §§ 416.920(a)(4)(ii), 416.920(c); *McCoy*, 648 F.3d at 611. At Step Three, the Commissioner evaluates whether the claimant's impairment meets or equals one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (the "listings"). 20 C.F.R. § 416.920(a)(4)(iii); *McCoy*, 648 F.3d at 611. If the claimant has such an impairment, the Commissioner will find the claimant disabled; if not, the Commissioner proceeds with the rest of the five-step process. 20 C.F.R. § 416.920(d); *McCoy*, 648 F.3d at 611.

Prior to Step Four, the Commissioner must assess the claimant's "residual functional capacity" ("RFC"), which is "the most a claimant can do despite [his or her] limitations." *Moore v. Astrue*, 572 F.3d 520, 523 (8th Cir. 2009) (citing 20 C.F.R. § 404.1545(a)(1)); *see also* 20 C.F.R. § 416.920(e). At Step Four, the Commissioner determines whether the claimant can return to his past relevant work, by comparing the claimant's RFC with the physical and mental demands of the claimant's past relevant work. 20 C.F.R. §§ 416.920(a)(4)(iv), 416.920(f); *McCoy*, 648 F.3d at 611. If the claimant can perform his past relevant work, he is not disabled; if

the claimant cannot, the analysis proceeds to the next step. *Id.* At Step Five, the Commissioner considers the claimant's RFC, age, education, and work experience to determine whether the claimant can make an adjustment to other work in the national economy; if the claimant cannot make an adjustment to other work, the claimant will be found disabled. 20 C.F.R. §416.920(a)(4)(v); *McCoy*, 648 F.3d at 611.

Through Step Four, the burden remains with the claimant to prove that he is disabled. *Moore*, 572 F.3d at 523. At Step Five, the burden shifts to the Commissioner to establish that, given the claimant's RFC, age, education, and work experience, there are a significant number of other jobs in the national economy that the claimant can perform. *Id.*; *Brock v. Astrue*, 674 F.3d 1062, 1064 (8th Cir. 2012).

### IV.   THE ALJ'S DECISION

Applying the foregoing five-step analysis, the ALJ here found that Plaintiff has not engaged in substantial gainful activity since December 31, 2009, his last date insured; that Plaintiff had the severe impairments of coronary artery disease, cardiomyopathy, carpal tunnel syndrome, and major depression; and that Plaintiff did not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. § 404, Subpart P, Appendix 1 (Tr. 13-14). The ALJ found that Plaintiff had the RFC to lift or carry twenty pounds occasionally and ten pounds frequently; sit six hours in an eight-hour day; stand and/or walk a total of six hours in an eight-hour day; and understand, remember, and carry out at least simple instructions and non-detailed tasks. She also found that he had to avoid hazardous heights and machinery. (Tr. 14). The ALJ found Plaintiff was unable to perform his past relevant work as a construction worker. However, relying on the testimony of a vocational expert, she found that there were a significant number of jobs in the national economy that

Plaintiff could perform, including fast food worker (*Dictionary of Occupational Titles* ("*DOT*") No. 311.472-010), cashier (*DOT* No. 211.462-010), and housekeeping cleaner (*DOT* No. 323.687-014). Accordingly, she found Plaintiff not disabled within the meaning of the Act. (Tr. 17).

## V.   DISCUSSION

Plaintiff challenges the ALJ's decision on three grounds: (1) that the ALJ failed to properly assess the opinion evidence in the case; (2) that the ALJ's hypothetical question to the vocational expert was incomplete and inconsistent with the RFC assessment in the hearing decision; and (3) that the ALJ failed to conduct a proper credibility analysis.

### A.  Standard for Judicial Review

The decision of the Commissioner must be affirmed if it complies with the relevant legal requirements and is supported by substantial evidence in the record as a whole. *See* 42 U.S.C. §§ 405(g); 1383(c)(3); *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Estes v. Barnhart*, 275 F.3d 722, 724 (8th Cir. 2002); *Pate-Fires v. Astrue*, 564 F.3d 935, 942 (8th Cir. 2009). "Substantial evidence 'is less than a preponderance, but enough that a reasonable mind might accept as adequate to support a conclusion.'" *Renstrom v. Astrue*, 680 F.3d 1057, 1063 (8th Cir. 2012) (quoting *Moore*, 572 F.3d at 522). In determining whether substantial evidence supports the Commissioner's decision, the court considers both evidence that supports that decision and evidence that detracts from that decision. *Id.* However, the court "'do[es] not reweigh the evidence presented to the ALJ, and [it] defer[s] to the ALJ's determinations regarding the credibility of testimony, as long as those determinations are supported by good reasons and substantial evidence.'" *Id.* at 1064 (quoting *Gonzales v. Barnhart*, 465 F.3d 890, 894 (8th Cir. 2006)). "'If, after reviewing the record, the court finds it is possible to draw two inconsistent

positions from the evidence and one of those positions represents the ALJ's findings, the court must affirm the ALJ's decision.'" *Partee v. Astrue*, 638 F.3d 860, 863 (8th Cir. 2011) (quoting *Goff v. Barnhart*, 421 F.3d 785, 789 (8th Cir. 2005)).

### B. The ALJ's Analysis of the Opinion Evidence Is Supported by Good Reasons and Substantial Evidence

Plaintiff first argues that the ALJ's decision should be reversed because the ALJ did not properly evaluate the opinions of the medical sources in the record: treating psychiatrist Dr. Baram, treating psychotherapist Amanda Bohnenstiehl, treating cardiologist Dr. Vardi, and state agency physician Tom Dees. The undersigned will address each in turn.

#### 1. The Opinion of Dr. Baram

Plaintiff first argues that the ALJ erred by giving "little weight" to the opinion of his treating psychiatrist, Dr. Baram, who stated that Plaintiff had only a "fair" ability to maintain his personal appearance and had no "poor or no" ability to function in every other mental work-related area assessed, including following work rules, relating to the public, using judgment, interacting with supervisors, being attentive and concentrating, following simple job instructions, behaving in an emotionally stable manner, and relating predictably in social situations. (Tr. 573). Dr. Baram also opined that Plaintiff had a GAF score of 38, was emotionally unstable, was a high suicide risk, and frequently needed intensive medication management and psychotherapy. (Tr. 572-73). The ALJ gave this opinion "little weight." (Tr. 16).

"A treating physician's opinion is given controlling weight if it 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [a claimant's] case record.'" *Tilley v. Astrue*, 580 F.3d 675, 679 (8th Cir. 2009) (quoting 20 C.F.R. § 404.1527(d)(2)); *Shontos v. Barnhart*, 328 F.3d 418, 426 (8th Cir. 2003). The ALJ may discount a treating physician's opinion if it is inconsistent with the

physician's treatment notes or with the record as a whole. *Halverson v. Astrue*, 600 F.3d 922, 929-30 (8th Cir. 2010). However, "'[w]hen an ALJ discounts a treating physician's opinion, he should give good reasons for doing so.'" *Martise v. Astrue*, 641 F.3d 909, 925 (8th Cir. 2011) (quoting *Davidson v. Astrue*, 501 F.3d 987, 990 (8th Cir. 2007)). If a treating physician's opinion is not given controlling weight, the amount of weight given to it "is to be governed by a number of factors [contained in 20 C.F.R. § 416.927(c)] including the examining relationship, the treatment relationship, consistency, specialization, and other factors." *Shontos*, 328 F.3d at 426 (citations omitted). In weighing a treating source opinion, it is the ALJ's duty to resolve conflicts in the evidence, and the ALJ's finding in that regard should not be disturbed so long as it falls within the "available zone of choice." *See, e.g., Hacker v. Barnhart*, 459 F.3d 934, 936-38 (8th Cir. 2006).

Here, a review of the record shows that the ALJ gave good reasons, supported by substantial evidence, for discounting Dr. Baram's opinions that brought the ALJ's assessment within the available zone of choice. The ALJ found Dr. Baram's opinion to be "grossly inconsistent with the mental status evaluation results Dr. Baram obtained for the claimant," and that finding was reasonable. (Tr. 16). Dr. Baram began treating Plaintiff in December 2012, after he was admitted to the hospital following a suicide attempt. (Tr. 15, 512-14). At the time Plaintiff was hospitalized, he had severe symptoms and a GAF score of 12, indicating a danger of hurting himself or others. (Tr. 513). However, by the time he was discharged two weeks later, his GAF score had risen to 52, indicating moderate symptoms or difficulties. (Tr. 514). As the ALJ noted, Dr. Baram's outpatient treatment notes dated after Plaintiff's hospitalization contain mostly moderate to unremarkable findings that do not support the extreme limitations in all areas of mental work-related functioning found in his opinion. Although Dr. Baram often found that

Plaintiff had a flat or blunted affect and a "fair," "so-so," or "7/10" mood, and occasionally found him to have soft speech or decreased motor activity, he also consistently found that Plaintiff was pleasant, cooperative, neatly dressed and well-groomed, had a logical flow of thought, and was without suicidal ideations, and Dr. Baram consistently left unchecked boxes that would have indicated a poor attention span, poor concentration, or poor memory. (Tr. 574-77, 599). These findings significantly undermine Dr. Baram's opinion that Plaintiff was a high suicide risk, had no useful ability to relate to co-workers or interact with supervisors, had no useful ability to be attentive or concentrate, had no useful ability to follow even simple job instructions, and had a seriously limited ability to maintain personal appearance. (Tr. 573). Dr. Baram's handwritten notes regarding Plaintiff's condition are minimal and also do not contain support for the extreme limitations in his opinion. At times he noted that Plaintiff had "a lot of worries," was "sad and low," was "depressed at times," or was staying in bed for three to four days. (Tr. 574-78, 599). However, in other notes he indicated that Plaintiff was feeling "more optimistic," was "planning to go fishing," and had come in third place in a tournament in Kentucky. (Tr. 574-76). Although Dr. Baram's notes certainly indicate that Plaintiff had some degree of mental limitation, it was reasonable for the ALJ to find his notes inconsistent with a finding that Plaintiff had no useful ability to function in nearly any area of work-related functioning. *See Toland v. Colvin*, 761 F.3d 931, 935-36 (8th Cir. 2014) (ALJ properly discounted treating physician's opinion that was inconsistent with physician's own treatment notes); *Halverson*, 600 F.3d at 930 (ALJ appropriately discounted treating doctor's limitations when they were inconsistent with the plaintiff's mental status examinations); *Davidson v. Astrue*, 578 F.3d 838, 843 (8th Cir. 2009) ("It is permissible for an ALJ to discount an opinion of a treating physician that is inconsistent with the physician's clinical treatment notes"); *Hacker v.*

*Barnhart*, 459 F.3d at 937 ("A treating physician's own inconsistency may . . . undermine his opinion and diminish or eliminate the weight given his opinions." ).

The ALJ also reasonably considered the fact that Dr. Baram did not begin treating Plaintiff until December 2012, which was more than a year into the alleged disability period. (Tr. 15). Indeed, as the ALJ noted, the record does not show any mental health treatment at all for Plaintiff until December 2012. Plaintiff's lack of treatment for over a year during the relevant period weighs against a finding that Plaintiff suffered from disabling mental impairments. *See Wright v. Colvin*, 789 F.3d 847, 854 (8th Cir. 2015) (complaints of disabling impairments were "undercut by the eight-month period during which he sought no medical care").

The undersigned further notes that Dr. Baram's opinions concerning extreme mental limitations in all areas are at odds with other evidence in the record, including the treatment notes of Ms. Bohnenstiehl, Plaintiff's therapist and case manager. In April 2013, Ms. Bohnenstiehl noted that Plaintiff "hasn't had any suicidal urges since admission to BJC-BH," and that "[h]e has had mostly physical complaints vs. mental health ones." (Tr. 592). In May 2013, Ms. Bohnenstiehl noted that Plaintiff was "in positive spirits" and that although sometimes he would stay in bed for 3 days at a time due to physical pain and weakness, "his mood is fine." (Tr. 594). In June 2013, she noted that his mood "has been 'good' and he feels his medication from Dr. Baram is working." (Tr. 595). In July 2013, she noted that Plaintiff had feelings of hopelessness since finding out that he had Hepatitis C, but that "he continues to have mostly physical complaints vs. mental health ones" and "continues to have no thoughts of suicide." (Tr. 597). These notes further support the ALJ's decision to discount Dr. Baram's opinion that Plaintiff had poor or no ability to function in nearly any mental work-related area.

Plaintiff also argues that the ALJ did not adequately address the GAF scores in the record, including Plaintiff's GAF score of 12 at the time of his initial hospitalization and the GAF score of 38 offered in Dr. Baram's opinion. Although Plaintiff is correct that the ALJ did not expressly discuss all of the GAF scores in the record, she was not required to do so. *See Craig v. Apfel*, 212 F.3d 433, 436 (8th Cir. 2000) ("Although required to develop the record fully and fairly, an ALJ is not required to discuss all the evidence submitted, and an ALJ's failure to cite specific evidence does not indicate that it was not considered."). The GAF score of 12 was assigned shortly after Plaintiff was hospitalized for a suicide attempt, and by the time he was discharged from the hospital, his GAF had risen to 52; there is no indication that the initial GAF score of 12 reflected his general level of functioning during the disability period. With regard to the GAF score of 38, that score was found in Dr. Baram's opinion, which the ALJ clearly considered and discounted. *See Bradley v. Astrue*, 528 F.3d 1113, 1115 n.3 (8th Cir. 2008); *Wildman v. Astrue*, 596 F.3d 959, 966 (8th Cir. 2010) ("Given the ALJ's specific references to findings set forth in Dr. Michaelson's notes, we find it 'highly unlikely that the ALJ did not consider and reject' [the physician's] statement that [the claimant] was markedly limited."). Moreover, there is nothing in Plaintiff's treatment records to indicate that a GAF of 12 or 38 reflects Plaintiff's long-term level of functioning. Plaintiff's outpatient treatment notes show GAF scores of 49 and 53, both of which are close to the GAF score of 52 that was discussed by the ALJ. (Tr. 468, 476). In addition, it is significant that "the Commissioner has declined to endorse the GAF scale for 'use in the Social Security and SSI disability programs'" and GAF scores are not dispositive of the disability determination. *Halverson*, 600 F.3d at 930-31 (quoting 65 Fed. Reg. 50746, 50746–65, 2000 WL 1173632 (Aug. 21, 2000)).

Finally, the undersigned notes that although the ALJ did not explicitly discuss all of the factors listed in § 416.927(c) in evaluating Dr. Baram's opinion, she was not required to do so. *See Nishke v. Astrue*, 878 F. Supp. 2d 958, 984 (E.D. Mo. 2012) (ALJ's failure to perform a factor-by-factor analysis of the 20 C.F.R. § 416.927(c) factors was not erroneous where the ALJ "explained his rationale in a manner that allowed the [court] to follow his line of reasoning"); *Derda v. Astrue*, No. 4:09-CV-01847 AGF, 2011 WL 1304909, at *10 (E.D. Mo. Mar. 30, 2011) ("While an ALJ must consider all of the factors set forth in 20 C.F.R. § 404.1527[c], he need not explicitly address each of the factors"). The ALJ cited 20 C.F.R. § 416.927 in her discussion and discussed several of the factors in her decision, including the consistency of Dr. Baram's opinion with his own treatment notes and other evidence, the fact that Dr. Baram only began treating Plaintiff in 2012, and the fact that Dr. Baram was a psychiatrist. (Tr. 12-13). The ALJ also "explained his rationale in a manner that allows the [Court] to follow his line of reasoning" *Nishke*, 878 F.Supp.2d at 984. No more was required to comply with the relevant regulations.

### 2. The Opinion of Ms. Bohnenstiehl

Plaintiff next argues that the ALJ unfairly discounted the opinion of Plaintiff's psychotherapist, Amanda Bohnenstiehl. In May 2013, Ms. Bohnenstiehl opined that Plaintiff was "not able to work normally at this time" and likely had not been able to work since the summer of 2012, though she stated that by January 2014, if his "pain was subsided and he remained non-suicidal, he could work." (Tr. 539). The ALJ found her opinion unpersuasive, noting that she was not an acceptable source for establishing the nature and severity of an impairment and that regardless of her credentials, her opinion was inconsistent with the record as a whole and was based on the Plaintiff's physical condition, which was "beyond the ken of a licensed professional counselor." (Tr. 16).

As Plaintiff correctly argues, the ALJ misstated the law when she suggested that because Ms. Bohnenstiehl (a therapist and licensed professional counselor) was not an "acceptable source" under 20 C.F.R. § 416.913(a), she could not offer evidence regarding the nature and severity of an impairment. (Tr. 16). Although only an acceptable medical source can establish the *existence* of a medically determinable impairment, 20 C.F.R. § 416.913(a), and only an acceptable medical source is a "treating source" whose opinion may be entitled to controlling weight, Social Security Ruling 06-03p, 2006 WL 2329939, at *2, other sources may be used "to show the severity of [a claimant's] impairment(s) and how it affects [a claimant's] ability to work," 20 C.F.R. § 416.913(d).

The ALJ's misstatement was harmless, however, because the ALJ went on to conduct a proper analysis of Ms. Bohnenstiehl's opinion. The ALJ properly noted that Ms. Bohnenstiehl's opinion that Plaintiff could not work was based in significant part on Plaintiff's physical condition, which was outside her expertise as a therapist. (Tr. 16). When asked to state her opinion as to whether Plaintiff's condition was severe enough to prevent him from working, Ms. Bohnenstiehl stated that Plaintiff "has had no severe depressive or suicidal issues since admission in January 2013" and that his "main complaints have been pain-related keeping him from being mobile much of the time." (Tr. 539). Because her opinion that Plaintiff cannot work was based largely on her assessment of Plaintiff's pain and mobility, rather than her assessment of his mental condition, the ALJ did not err in discounting her opinion as being based on matters outside her expertise. *See Wildman,* 596 F.3d at 967 ("After reviewing the opinions, we agree that the psychologists largely based their determination that [the plaintiff] could not work on their analysis of [the plaintiff's] physical ailments. Since this is indeed beyond their expertise as psychologists, the ALJ did not err when he disregarded their opinions for this reason.").

In addition, the undersigned notes that Ms. Bohnenstiehl's statement that Plaintiff cannot work is an opinion on an issue reserved to the Commissioner and is not entitled to the same deference as a medical opinion. *See House v. Astrue*, 500 F.3d 741, 745 (8th Cir. 2007) ("A treating physician's opinion that a claimant is disabled or cannot be gainfully employed gets no deference because it invades the province of the Commissioner to make the ultimate disability determination."); *Ellis v. Barnhart*, 392 F.3d 988, 994 (8th Cir. 2005) ("A medical source opinion that an applicant is 'disabled' or 'unable to work' . . . involves an issue reserved for the Commissioner and therefore is not the type of 'medical opinion' to which the Commissioner gives controlling weight.").

### 3.  The Opinion of Dr. Vardi

Plaintiff's next argument is that the ALJ improperly discounted the opinion of Dr. Vardi because she incorrectly summarized Dr. Vardi's findings regarding Plaintiff's level of cardiac disease. The "opinion" at issue is a two-line statement in a May 2013 "Pre-Sedation Physician Assessment" that states, "ASA Physical Status Classification: 3 (A patient with severe systemic disease." (Tr. 532-33). As Plaintiff correctly points out, the ALJ mistakenly read this note as classifying Plaintiff as a "class 3 cardiac patient" under the New York Heart Association's classification system, a classification that indicates a marked limitation of physical activity, comfort only at rest, and symptoms even during less than ordinary activity. *See* Pl's. Br. at 10 n.4. However, the parties agree that the note at issue actually referenced the American Society of Anesthesiologists (ASA) Physical Status classification rating, under which a class 3 patient is one with "substantive functional limitations; One or more moderate to severe diseases." *See* ASA Physical Status Classification System, https://www.asahq.org/resources/clinical-information/asa-physical-status-classification-system, last visited February 26, 2016.

The ALJ's mistake concerning the classification system used by Dr. Vardi is harmless and does not require remand. The ASA classification actually used by Dr. Vardi does not purport to indicate that a patient has any specific level of functional limitation. The ALJ's finding that Plaintiff has several severe impairments and can perform less than a full range of light work is entirely consistent with Dr. Vardi's assignment of him to a class of patients with "one or more moderate to severe diseases" and "substantive functional limitations." Because the ALJ's RFC finding is consistent with Dr. Vardi's findings, the ALJ's error in describing those findings is harmless. *Cf. Casey v. Astrue*, 503 F.3d 687, 694-95 (8th Cir. 2007) (ALJ's misquoting of examining psychologist's opinion was harmless "in the context of the whole record").

### 4. The Opinion of Dr. Dees

Finally, Plaintiff argues that the ALJ erred by giving "considerable weight" to the opinion of state agency physician Tom Dees, who reviewed the medical evidence in June 2012 and found that Plaintiff could perform light duties with minimal exertional activity. (Tr. 15, 433). Plaintiff argues that Dr. Dees's opinion was not entitled to this weight because he never examined Plaintiff and was privy only to medical records in existence prior to June 2012.

The undersigned finds no error. It is entirely proper for the ALJ to consider the opinion of a non-examining state agency physician along with the record as a whole. *See Casey,* 503 F.3d at 694 ("The ALJ did not err in considering the opinion of [the State agency medical consultant] along with the medical evidence as a whole."). Here, the ALJ did not simply adopt the June 2012 conclusions of Dr. Dees while ignoring the rest of the record and the later-developed medical evidence. Rather, she considered Dr. Dees' opinion in the context of the entire record, adopting his conclusions to some extent but also adding additional limitations not found in Dr. Dees' opinion. She accounted for Plaintiff's 2013 syncopal episodes by adding to the RFC a limitation

19

to no work around hazardous heights and machinery, and she accounted for Plaintiff's 2013 mental impairments by adding to the RFC a limitation to understanding, remembering, and carrying out only simple instructions and non-detailed tasks. (Tr. 14).

For all of the above reasons, the undersigned finds that the ALJ's assessment of the opinion evidence in this case was supported by substantial evidence and good reasons, falls within the available "zone of choice," and should not be disturbed. *See Hacker*, 459 F.3d at 936 ("[T]his Court will disturb the ALJ's decision only if it falls outside the available 'zone of choice.'").

### C. The Vocational Expert's Response to the Hypothetical Question Constitutes Substantial Evidence to Support the ALJ's Step Five Finding

Plaintiff's next contention is that the ALJ's finding at Step Five that there are a significant number of jobs existing in the national economy that Plaintiff could perform is not supported by substantial evidence because of several inadequacies in the hypothetical question posed to the vocational expert ("VE") at the hearing. "Testimony from a vocational expert constitutes substantial evidence only when based on a properly phrased hypothetical question." *Pickney v. Chater*, 96 F.3d 294, 296 (8th Cir. 1996). "[T]he ALJ's hypothetical question must include the impairments that the ALJ finds are substantially supported by the record as a whole." *Id.*

Plaintiff first argues that the question posed to the VE was inadequate because it was not identical to the RFC finding in the written decision. In the RFC, the ALJ stated that Plaintiff was "able to understand, remember and carry out at least simple instructions and non-detailed tasks." (Tr. 14). In contrast, the only mental limitation in the hypothetical question was a limitation to "unskilled work." (Tr. 52). Defendant argues that this error was harmless, and the undersigned agrees. In substantially similar situations, this court has consistently found that the ALJ's error is

harmless and does not require remand. In *Miller v. Colvin*, for example, the ALJ found in the RFC that the plaintiff could "understand, remember, and carry out at least simple instructions and non-detailed tasks," yet posed a question to the VE about a hypothetical person who was limited only to "unskilled work." No. 4:14-CV-155 NAB, 2014 WL 7392154, at *5 (E.D. Mo. Dec. 29, 2014). In response to the hypothetical question, the VE identified two jobs that required Level 2 reasoning according to the Dictionary of Occupational Titles, which means "the employee applies commonsense understanding to carry out detailed, but uninvolved written or oral instructions and deal with problems involving a few concrete variables in or from standardized situations." *See Miller*, 2014 WL 7392154, at *5. The court held that the mental limitations identified in the RFC were "not inconsistent with work requiring Level 2 reasoning." *Miller*, 2014 WL 7392154. The court therefore concluded that the inconsistency between the RFC and the hypothetical question was harmless error and that the vocational expert's testimony constituted substantial evidence. *Id.* at *6. *See also Wilson v. Colvin*, No. 4:13-CV-1533 AGF-NAB, 2014 WL 4741091, at *9 (E.D. Mo. Sept. 23, 2014) (ALJ's error in posing hypothetical question that described a person limited to "unskilled work" but did not include the RFC finding that Plaintiff had the ability to "understand, remember, and carry out at least simple instructions and non-detailed tasks" did not require reversal; jobs identified by the Vocational Expert required Level 2 reasoning, which was not inconsistent with the RFC); *Areno v. Colvin*, No. 4:12-CV-1669 DDN, 2013 WL 5291754, at *15 (E.D. Mo. Sept. 19, 2013) ("Although the ALJ did not present the limitation regarding plaintiff's ability to understand, remember, and perform only simple instructions and non-detailed tasks, the ALJ committed harmless error. Because the . . . . RFC limitations are, at least, not inconsistent with work requiring Level 2

reasoning, . . . substantial evidence supports the ALJ's finding that plaintiff could perform work as an addresser.").

Here, as in the above cases, the ALJ did err by failing to present to the VE the limitation regarding Plaintiff's limitation to the ability to "understand, remember, and carry out at least simple instructions and non-detailed tasks." However, also as in the above cases, the jobs identified by the VE included two jobs that require at most Level 2 reasoning, according to the *Dictionary of Occupational Titles*: the job of fast food worker (Level 2) and the job of cleaner, housekeeping (Level 1). *See DOT* No. 311.472-010, 1991 WL 672682 (job of fast-foods worker requires Level 2 reasoning); *DOT* No. 323.687-014, 1991 WL 672783 (job of cleaner, housekeeping requires Level 1 reasoning, which requires one to "[a]pply commonsense understanding to carry out simple one- or two-step instructions" and "[d]eal with standardized situations with occasional or no variables in or from these situations encountered on the job"). The undersigned agrees with the reasoning of the courts in *Miller*, *Wilson*, and *Areno*, and finds that the limitations in Plaintiff's RFC are not inconsistent with the requirements of these jobs. Therefore, as in those cases, the ALJ's error was harmless and does not require remand.

Plaintiff also argues that the hypothetical question was defective because it failed to include all of his mental limitations, including limitations in his ability to deal with the public; interact with supervisors; understand, remember, or carry out simple instructions; and behave in an emotionally stable manner. However, the hypothetical question need only include those functional limitations that the ALJ found credible and well supported by the record. *See Smith v. Colvin*, 756 F.3d 621, 627 (8th Cir. 2014). As discussed above, the ALJ properly rejected some of the functional limitations outlined in Dr. Baram's opinion. As discussed below, the ALJ also conducted a proper analysis to find that Plaintiff's subjective complaints were not fully credible.

Based on these findings, the ALJ developed the RFC and corresponding hypothetical question that included all of the limitations she found credible. Because the hypothetical to the VE adequately captured the consequences of Plaintiff's impairments that were supported by the record, the response to that hypothetical question constitutes substantial evidence to support the ALJ's finding at Step Five. *See Robson v. Astrue*, 526 F.3d 389, 393 (8th Cir. 2008) (finding substantial evidence supporting the ALJ's conclusion at Step Five where the ALJ's hypothetical posed to the VE contained all of the concrete consequences of the plaintiff's impairments).

### D.  The ALJ Properly Analyzed Plaintiff's Credibility

Plaintiff's final argument is that the ALJ did not conduct a proper analysis of the credibility of Plaintiff's subjective complaints.

When evaluating the credibility of a plaintiff's subjective complaints, the ALJ must consider several factors: "(1) the claimant's daily activities; (2) the duration, intensity, and frequency of pain; (3) the precipitating and aggravating factors; (4) the dosage, effectiveness, and side effects of medication; (5) any functional restrictions; (6) the claimant's work history; and (7) the absence of objective medical evidence to support the claimant's complaints." *Moore v. Astrue*, 572 F.3d 520, 524 (8th Cir. 2009) (citing *Finch v. Astrue*, 547 F.3d 933, 935 (8th Cir. 2008) and *Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984)). "'An ALJ who rejects subjective complaints must make an express credibility determination explaining the reason for discrediting the complaints.'" *Moore*, 572 F.3d at 524 (quoting *Singh v. Apfel*, 222 F.3d 448, 452 (8th Cir. 2000)). However, the ALJ need not explicitly discuss each factor. *Id.* (citing *Goff v. Barnhart*, 421 F.3d 785, 791 (8th Cir. 2005)). It is sufficient if the ALJ "'acknowledges and considers the factors before discounting a claimant's subjective complaints.'" *Id.* The ALJ may not discount allegations of disabling pain solely because they are not fully supported by the

medical evidence, but such allegations may be found not credible if they are inconsistent with the record as a whole. *Ellis v. Barnhart*, 392 F.3d 988, 996 (8th Cir. 2005). The court "will defer to the ALJ's credibility finding if the ALJ 'explicitly discredits a claimant's testimony and gives a good reason for doing so.'" *Buckner v. Astrue*, 646 F.3d 549, 558 (8th Cir. 2011) (quoting *Wildman v. Astrue*, 596 F.3d 959, 968 (8th Cir. 2010)).

Here, the ALJ expressly found Plaintiff's subjective complaints "not entirely credible" based on several of the relevant credibility factors. First, the ALJ reasonably considered Plaintiff's activities of daily living, finding that Plaintiff's reports of shopping and fishing were inconsistent with his assertions that he could not walk more than one block at a time and could not grasp objects, and that his ability to participate in and place third in a fishing tournament in Kentucky was inconsistent with his assertion of a completely inactive lifestyle. (Tr. 16). Plaintiff also reported to his therapist in 2013 that he did various jobs around the house for his parents, including electrical work, painting, and other repairs. (Tr. 595). While a claimant "need not prove she is bedridden or completely helpless to be found disabled," *Reed v. Barnhart*, 399 F.3d 917, 923 (8th Cir. 2005) (internal quotation marks omitted), Plaintiff's daily activities can nonetheless be seen as inconsistent with his subjective complaints of a disabling impairment and may be considered in judging the credibility of his complaints. *See Davis v. Apfel*, 239 F.3d 962, 967 (8th Cir. 2001) ("Allegations of pain may be discredited by evidence of daily activities inconsistent with such allegations."); *Medhaug v. Astrue*, 578 F.3d 805, 875 (8th Cir. 2009) ("[A]cts such as cooking, vacuuming, washing dishes, doing laundry, shopping, driving, and walking, are inconsistent with subjective complaints of disabling pain.").

Second, the ALJ reasonably considered the intensity and frequency of Plaintiff's symptoms and found that they did not entirely support Plaintiff's allegations, noting for example

that Plaintiff reported to his cardiologist in August 2012 that he had remained active, that he did not always have chest pain with exertion, and that he only required nitroglycerine for chest pain less than once a month. (Tr. 16). The ALJ also properly considered that Plaintiff had not received any mental health treatment at all until more than a year into the disability period. *Edwards v. Barnhart*, 314 F.3d 961, 967 (8th Cir. 2003) ("An ALJ may discount a claimant's subjective complaints based on the claimant's failure to pursue regular medical treatment."); *Wright v. Colvin*, 789 F.3d 847, 854 (8th Cir. 2015) (complaints of disabling impairments were "undercut by the eight-month period during which he sought no medical care").

Third, the ALJ properly considered the unremarkable or mild objective examination findings made during the disability period, including several normal mental findings and several normal cardiovascular examination results. (Tr. 15-16). *See Goff v. Barnhart*, 421 F.3d 785, 792 (holding that it was proper for the ALJ to consider unremarkable or mild objective medical findings as one factor in assessing credibility of subjective complaints).

The ALJ also properly considered inconsistencies between Plaintiff's own reports and his contention that his mental impairments preclude him from following even simple instructions and relating to others. As the ALJ pointed out, in Plaintiff's December 2011 Function Report, Plaintiff conceded that he had a good ability to follow written instructions and that he gets along well with others, including authority figures. (Tr. 16, 174-76). *See Eichelberger v. Barnhart*, 390 F.3d 584, 589 (8th Cir. 2004) (finding it proper for ALJ to consider "inherent inconsistencies or other circumstances"); *Ply v. Massanari*, 251 F.3d 777, 779 (8th Cir. 2001) (noting that inconsistencies in the claimant's statements about his daily activities were a factor for the ALJ to consider in assessing the plaintiff's credibility).

Finally, the ALJ reasonably considered Plaintiff's poor earnings history, noting that between 1998 and 2007 he had no earnings in four years and less than $14,000 in annual income in four years. (Tr. 16). "A lack of work history may indicate a lack of motivation to work rather than a lack of ability." *Pearsall v. Massanari*, 274 F.3d 1211, 1218 (8th Cir. 2001) (citing *Woolf v. Shalala*, 3 F.3d 1210, 1214 (8th Cir. 1993)).

For all of the above reasons, the undersigned finds that the ALJ's credibility determination was supported by good reasons and substantial evidence and that the court should defer to that determination. *See Smith*, 756 F.3d at 625 ("We defer to the ALJ's evaluation of [a claimant's] credibility, provided that such determination is supported by good reasons and substantial evidence, even if every factor is not discussed in depth.") (quotation marks omitted).

## VI. CONCLUSION

For the reasons set forth above, the undersigned finds that substantial evidence on the record as a whole supports the Commissioner's decision that Plaintiff is not disabled.

Accordingly,

**IT IS HEREBY RECOMMENDED** that the final decision of the Commissioner denying social security benefits be **AFFIRMED**.

The parties are advised that they have 14 days to file written objections to this Report and Recommendation. The failure to file timely written objections may waive the right to appeal issues of fact.

SHIRLEY PADMORE MENSAH
UNITED STATES MAGISTRATE JUDGE

Dated this 26th day of February, 2016.